CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CLAIRE KENNEDY (Bar No. 333632)
(E-Mail: claire_kennedy@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ISAI CARRILLO

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ISAI CARRILLO, <br><br> Defendant. | Case No. 2:25-MJ-6733-DUTY-2 <br><br> **ISAI CARRILLO'S BRIEF IN SUPPORT OF HIS CONTINUED RELEASE ON BOND** |

Isai Carrillo has been released on bond, without issue, since October 29, 2025. The government has appealed and seeks to detain him pending trial. By and through his attorney of record, Deputy Federal Public Defender Claire Kennedy, Mr. Carrillo hereby files this brief in support of his continued release on bond.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 10, 2025       By  */s/ Claire Kennedy*
CLAIRE KENNEDY
Deputy Federal Public Defender
Attorney for ISAI CARRILLO

1

**TABLE OF CONTENTS**

Page

I. RELEVANT BACKGROUND ................................................................................ 1

II. ARGUMENT ........................................................................................................ 2

    A.    The defense maintains that the government has not shown it is even entitled to a detention hearing. ................................................................... 3

    B.    The government has the burden to prove that Mr. Carrillo poses a risk of flight or danger that cannot be mitigated by conditions of release .................. 4

        1.    No evidence suggests that Mr. Carrillo is a flight risk, and any lingering concerns can be addressed through location monitoring. ...... 5

        2.    There is no evidence Mr. Carrillo poses an active danger to the community. ............................................................................................ 5

            a.    The government invited a civilian news crew to participate in Mr. Carrillo's arrest, which underscores that he is not a seriously dangerous person. ................................. 6

    C.    The government's identification of Mr. Carrillo as the person who threw rocks is flimsy. ............................................................................................. 7

III. CONCLUSION ................................................................................................... 9

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. RELEVANT BACKGROUND

Mr. Carrillo is 31-year-old man with limited criminal history. He is a United States citizen, and the child of immigrants. He has three minor children, and has worked as a carpenter with the union for the last ten years. The government alleges that Mr. Carrillo is one of nine subjects (seven of which remain unknown) who conspired to impede or injure federal immigration officers who were purportedly conducting lawful immigration raids at Glass House Farms on July 10, 2025. (*See* ECF 1). Although the incident occurred on July 10, 2025, Mr. Carrillo was arrested on a complaint filed just one day before his arrest on October 29, 2025. (*See id.*). Several armed agents arrived at his home in the early hours of the morning. Mr. Carrillo, who was getting dressed to leave for work, exited his home and was arrested outside. Fox News was given exclusive coverage of Mr. Carrillo's arrest. Federal agents posed Mr. Carrillo for post-arrest photos that have been widely circulated online.[1] While these agents chose to hide their faces, Mr. Carrillo was forced to show his own.

On October 29, 2025, Mr. Carrillo appeared before the Honorable Jacqueline Chooljian for his initial appearance and detention hearing. (ECF 9). The Pretrial Services Office interviewed Mr. Carillo and considered the complaint, as well as information obtained from agents, and recommended that Mr. Carrillo be released on $5,000 unsecured appearance bond. The defense agreed with Pretrial's recommendation, and, for extra measure, offered even more conditions: that Mr. Carrillo could sign a larger bond in the amount of $10,000, and that he would stipulate to location monitoring. The Court agreed, and ordered Mr. Carrillo released on bond,

---

[1] *See* Fox New's Reporter Matt Finn's X Account, (last accessed on November 10, 2025), https://x.com/MattFinnFNC/status/1983571265467371527. The defense argues that photos like these do not further the government's prosecutorial interests, and instead have only served to embarrass and humiliate Mr. Carrillo. For example, Mr. Carrillo's employer saw his photo on the news and decided to remove him from the construction project he had been assigned to work on.

1

incorporating the conditions requested by Pretrial and the defense. He was released later that night, and promptly contacted Pretrial Services the next morning. His ankle monitor was installed, and he has remained on bond for the last two weeks without issue. In fact, Mr. Carrillo has even traveled to the Pretrial Services Office to meet with his assigned officer in person.

The government has appealed Mr. Carrillo's release on bond—as it has recently done in every other case where a person alleged to have impeded immigration enforcement was granted bond. The government does not propose additional conditions which might address some of its concerns. Instead, it maintains that detention is the *only* option here. The government's position is unreasonable, and is contrary to the spirit of the Bail Reform Act. *See United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972) ("The whole spirit of the [Act] is that a defendant . . . should be released, rather than detained, unless there are strong reasons for not releasing him") (describing former version of the Act); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985) ("[F]ederal law has traditionally provided that a person arrested for a noncapital offense shall be admitted to bail," that only "in rare circumstances should release be denied," and that all "[d]oubts regarding the propriety of release should be resolved in favor of the defendant."). This Court should uphold Judge Chooljian's order that Mr. Carrillo be granted pretrial release and should be permitted to fight these criminal charges on fairer footing.

## II. ARGUMENT

"Bail is . . . basic to our system of law," *Schilb v. Kuebel*, 404 U.S. 357, 365 (1971), and "[i]n our society, liberty is the norm, [while] detention prior to trial" is "the . . . limited exception," *United States v. Salerno*, 481 U.S. 739, 755 (1987). "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction." *Stack v. Boyle*, 342 U.S. 1, 4 (1951).

A. **The defense maintains that the government has not shown it is even entitled to a detention hearing.**

As an initial matter, the government is not even entitled to a detention hearing here because it has not made a fact-specific showing of a "serious risk" of flight. 18 U.S.C. § 3142(f)(2)(A). The Bail Reform Act splits the determination of detention versus release into two parts. First, the Court must first determine whether the government is entitled to a detention hearing at all. 18 U.S.C. § 3142(f). If the Court concludes the government is not entitled to a detention hearing, then the Court must order the person released on appropriate conditions. *Id*. at § 3142(a), (b), (c). If the Court finds that the government is entitled to a detention hearing, then the Court holds such a hearing to determine whether there are conditions that would reasonably assure the person's appearance and the safety of the community. *Id*. at § 3142(f).

The statute provides that the government is automatically entitled to a detention hearing in cases involving certain serious charges. *Id*. at § 3142(f)(1)(A)-(E). Conspiracy to impede or injure federal officers is not among those charges. *See id*. Thus, the government is only entitled to a detention hearing here if it can prove "a *serious risk* that [Mr. Carrillo] will flee." *Id*. at § 3142(f)(2)(A) (emphasis added).[2] To make that showing, the government must point to evidence in the record. *See, e.g.*, *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) (explaining that when the only basis for detention is § 3142(f)(2)(A), a defendant "may be detained only if the record supports a finding that he presents a serious risk of flight"). Further, § 3142(f)(2)(A) is the only time the Bail Reform Act uses the phrase "serious risk" of flight. That distinction suggests that "serious risk of flight" denotes a special danger— i.e., that the defendant will flee the jurisdiction—beyond simple nonappearance. *United States v. White*, 2021 WL 2155441, at *10 (M.D. Tenn. May 27, 2021) (recognizing

---

[2] The government argued it was entitled to a detention hearing on this basis. (*See* ECF 5 at 5).

3

that "serious flight risk" is "narrower" than "flight risk" and is "distinct from 'risk of non-appearance'").

Although the government argues is entitled to a detention hearing based on "a serious risk that [Mr. Carrillo] will flee," it presented no evidence to support this claim. *See* Ex. A (showing that the government made no arguments addressing serious risk of flight before the magistrate). The defense maintains that there is no evidence in the record to conclude that there is a serious risk Mr. Carrillo will flee. He is a lifelong resident of the District. He has worked as a carpenter with the union for over ten years. He has three minor children within the District who he helps financially support. His mother and siblings live here. He has little to no history of international travel—his most recent international travel was to visit his extended family in Mexico when he was ten years old. On top of this, in October 2024 he successfully completed a diversionary program (and his case relating to possession of a dirk or dagger was dismissed), which shows that Mr. Carrillo has historically shown up when required, and can comply with court orders. This fact cuts against ordinary risk of flight, let alone *serious* risk of flight.

Because the government has pointed to no evidence in the record suggesting there is serious risk Mr. Carrillo will flee, the government is not even entitled to a detention hearing here. As a result, the Court should uphold Judge Chooljian's order that Mr. Carrillo be granted pretrial release on certain conditions.

**B.   The government has the burden to prove that Mr. Carrillo poses a risk of flight or danger that cannot be mitigated by conditions of release**

Even if the government could somehow show that it is entitled to a detention hearing here, the government still bears the burden of showing that there is no combination of conditions that can be imposed to assure Mr. Carrillo's appearance or mitigate danger to the community. *See* 18 U.S.C. § 3142(e); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) ("[T]he government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community.").

4

### 1. No evidence suggests that Mr. Carrillo is a flight risk, and any lingering concerns can be addressed through location monitoring.

For the same reasons the government cannot show there is "serious risk" Mr. Carrillo will flee, the government cannot show Mr. Carrillo poses an ordinary risk of flight that cannot be adequately addressed through conditions of his pretrial release. As mentioned above, Mr. Carrillo is a lifelong resident of this District. He has a stable job and three children he helps financially support. There is simply no evidence in the record suggesting Mr. Carrillo has failed to show up to court hearings, or violated the conditions of any previous terms of diversion or probation.

What is more, is that Mr. Carrillo is currently released on location monitoring with an ankle bracelet, which allows the supervising officer to know his location at all times. He is also subject to a curfew set at the discretion of the supervising agency. These conditions certainly address any lingering concerns the government might have about Mr. Carrillo's nonappearance.

### 2. There is no evidence Mr. Carrillo poses an active danger to the community.

Next, there is no evidence that Mr. Carrillo poses such a significant danger to his community that he must be detained pending trial. Although the government claims the charged offense "was just one incident in an ongoing conspiracy that had and will continue to put law enforcement in danger," the complaint alleges that Mr. Carrillo engaged in criminal conduct on only one day: July 10, 2025. Since then, he has remained in the community, without issue, for the past four months.[3]

The government overstates Mr. Carrillo's criminal history in its application for bail review. The pretrial services report reflects only three misdemeanor convictions: (1) malicious mischief to a vehicle when Mr. Carrillo was eighteen years old; (2)

---

[3] Given that so much time has passed, it is unclear why Mr. Carrillo was suddenly arrested on a complaint rather than an indictment.

possession of a switchblade is a vehicle from 2018; and (3) assault from 2019. *See* PSA Report at 4. Next, although Mr. Carrillo may have been charged with the misdemeanor offense of carrying a dirk or dagger, it appears he successfully completed a diversionary program in October 2024 and the case was dismissed. *See id*. at 5. Moreover, the government's reliance on arrests, where no charges were ever filed, or where charges may have been filed but were later dismissed, is troubling. This suggests that the government believes every time a person is arrested by local law enforcement, they must be guilty of the crime (even if no case was ever brought against that person). This, of course, is not true. And even if these arrests were a legitimate basis to infer danger, search conditions, and regular supervision can adequately address any hypothetical danger to the community.

        **a.**     **The government invited a civilian news crew to participate in Mr. Carrillo's arrest, which underscores that he is not a seriously dangerous person.**

Lastly, the government's position about Mr. Carrillo's danger to the community is undermined by its own conduct. The government (Homeland Security) gave Fox News exclusive access to cover Mr. Carrillo's arrest in the early hours of October 29, 2025.[4] The government invited civilians (presumably with news equipment) to catch Mr. Carrillo at his home, by surprise. If the government *truly* believed that Mr. Carrillo was a violent or dangerous person, and was truly worried about the risk Mr. Carrillo posed to public safety, the government would not have invited members of the public to be present while effectuating his arrest. Instead, the instant request for bail review appears to be part of a new pattern at the USAO where review is sought automatically

---

[4] *See* Luis Casiano, *Feds nab anti-ICE activists in sweeping pre-dawn LA raid*, Fox News (last accessed on November 10, 2025), available at https://www.foxnews.com/us/feds-nab-anti-ice-activists-sweeping-pre-dawn-la-raid (stating that "Fox News was exclusively embedded with Homeland Security during the pre-dawn arrest of Isai Carrillo,").

6

in every case in which bond was granted by the magistrate for a person alleged to have impeded immigration enforcement.[5] This suggests that the instant request for detention is not tethered to specific factors within the Bail Reform Act, but pursuant to a new blanket policy at the USAO when bond is granted for cases like this one.

### C. The government's identification of Mr. Carrillo as the person who threw rocks is flimsy.

The identification of Mr. Carrillo as the person who threw rocks at unmarked vehicles allegedly belonging to ICE rests on shaky ground. A closer look at the complaint reveals this. The early pages of the complaint identify nine subjects, all who were present during the raid on Glass House Farms. Many subjects appear to be males, and many stills contained in the complaint are grainy. While the agent claims Mr. Carrillo's driver's license photo resembles the "likeness" of Subject #4, (*see* ECF 1 at 26), it is hard to make out distinct facial features. Indeed, agents do not claim to identify Mr. Carrillo on this basis. Instead, the agent claims he identified Mr. Carrillo as Subject #4 based on a text conversation (and photo) found on his sister's phone <u>from November 2024</u> (nine months before the incident at Glass House Farms occurred). In that text conversation, Mr. Carrillo's sister sends a photo of some construction boots, and Mr. Carrillo tells his sister to purchase him a pair.

//

---

[5] *See United States v. Carlitos Ricardo Parias*, 2:25-cr-6539-DUTY (bond granted on October 31, 2025 and review sought on that same day); *United States v. Ismael Vega*, 2:25-cr-6126-DUTY-9 (bond granted on October 29, 2025 and review sought on October 31, 2025); *United States v. Yachua Flores*, 2:25-cr-6126-DUTY-8 (bond granted on October 29, 2025 and review sought on November 4, 2025); *United States v. Virginia Reyes*, 2:25-cr-6733-DUTY-1 (bond granted on October 30, 2025 and review sought on November 6, 2025).

(ECF 1 at 26).

The agent claims that because the person who threw rocks "is wearing the same or similar boots" it must be Mr. Carrillo. (*Id*.). But many people who attend protests often wear construction boots for protection. Even then, construction boots tend to all look the same— most are tan.

Thus, while the complaint is several pages long, there is slim evidence connecting Mr. Carrillo to the actions alleged in the complaint. Assuming for argument sake that Mr. Carrillo was even affiliated with, or a member of VC Defensa, that by itself does not transform him into a danger to his community. If anything, the opposite is true—VC Defensa is a well-funded, and well-organized coalition of local organizations that seeks to empower immigrants in the Ventura County community.[6] They provide preparedness plans to immigrant families who are impacted by the recent uptick in ICE raids, and they educate immigrants on their rights. If organizers detect illegal activity by ICE or HSI, they report it.

---

[6] *See* VC Defensa's website, https://vcdefensa.org/.

8

While the agent who swore out the complaint characterized VC Defensa as a group which "chase[s], agitate[s] and impede[s] federal agents and their operations so that immigration arrests are unsuccessful," (ECF 1 at 4), VC Defensa's own website makes clear that they do not break any laws, or obstruct lawful enforcement operations.

### III. CONCLUSION

For the foregoing reasons, Mr. Castillo respectfully requests that the Court uphold Judge Chooljian's order that he be released subject to conditions while his case is pending.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 10, 2025        By /s/ *Claire Kennedy*
CLAIRE KENNEDY
Deputy Federal Public Defender
Attorney for ISAI CARRILLO

9